AO 106 (Rev. 04/10) Application for a Search Warrant                AUTHORIZED AND APPROVED/DATE:

# UNITED STATES DISTRICT COURT

**FILED**

for the

Western District of Oklahoma

MAR 2 2 2024

CARMELITA REEDER SHINN, CLERK
U.S. DIST. COURT, WESTERN DIS. OKLA.
BY_____,DEPUTY

In the Matter of the Search of )
*(Briefly describe the property to be searched or identify the person by name and address)* )
Premises known as 1520 SW 25th Street, Oklahoma City, Oklahoma 73108, surrounding curtilage, and any vehicles, garages, and outbuildings thereon )

Case No. M-24-248    -STE

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

Located in the Western District of Oklahoma, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 846 | Drug Conspiracy |
| 21 U.S.C. § 841 | Distribution of a Controlled Substance |

The application is based on these facts:
See attached Affidavit of FBI Special Agent Hanna Ortego

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days (give exact ending date if more than 30 days:(_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Hanna Ortego, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 3/22/24

_____
*Judge's signature*

City and state: Oklahoma City, Oklahoma

SHON T. ERWIN, United States Magistrate Judge
*Printed name and title*

WESTERN DISTRICT OF OKLAHOMA
OKLAHOMA CITY, OKLAHOMA

STATE OF OKLAHOMA )
)
COUNTY OF OKLAHOMA )

### AFFIDAVIT

I, Hanna Ortego, Special Agent with the Federal Bureau of Investigation (FBI), having been duly sworn, depose and state as follows:

1. I have been a Special Agent with the FBI since June 2022. Prior to this appointment, I was assigned to the FBI New Orleans Field Office, Lafayette Resident Agency, as a Safe Streets Task Force Officer from June 2019 until my appointment as an FBI Special Agent. I am currently assigned to the Oklahoma City Division, where I am assigned to the Criminal Enterprise Squad, which is responsible for investigating, among other things, the unlawful distribution of narcotics in violation of 21 U.S.C. §§ 841(a)(1) and 846. Through my training and experience, I have become familiar with the methods and operation of drug distributors, including their common organizational structures, use of violence, methods of manufacturing, distributing, storing, and transporting drugs, and methods of collecting and laundering drug proceeds. As part of my investigative experience as an FBI Special Agent, I have been the affiant in multiple Title III wire intercept affidavits, executed search and arrest warrants, conducted physical surveillance, coordinated controlled purchases with confidential sources, analyzed records documenting the purchase and sale of illegal drugs, and spoken with informants and subjects, as well as other local and federal law enforcement officers, regarding the manner in which drug distributors obtain, finance, store, manufacture, transport, and

1

distribute their illegal drugs.

2. The facts set forth below are based upon my own personal observations, reports and information provided to me, other documents obtained during the course of this investigation. All of the below-described dates and times are approximate.

3. The information contained in this Affidavit is submitted for the limited purpose of establishing probable cause to secure a search warrant for 1520 SW 25th St, Oklahoma City, Oklahoma 73108 (the **Subject Property**), as described further in **Attachment A** (physical description) for evidence of violations of 21 U.S.C. § 841(a)(1) (manufacturing, possessing, distributing and selling of controlled substances) and 21 U.S.C. § 846 (drug conspiracy), as described further in **Attachment B** (description of items to be seized). Since this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause for the requested warrant.

## BACKGROUND REGARDING DRUG CASES

4. As discussed previously, based on my training, experience, and consultation with other seasoned drug investigators, I am familiar with the *modus operandi* of drug traffickers. Based on my training and experience, as well as my participation in numerous drug-related investigations, I know the following:

   a) I am aware that drug dealers frequently keep assets, records, and documents related to their drug distribution organizations, and monies derived from the sale of illegal drugs, in their own residences, businesses, as well as in safe houses where they are not easily detectable by law enforcement officials conducting investigations.

2

Further, I am aware that these individuals will frequently maintain these houses in the name of other individuals, also to avoid detection by law enforcement agencies.

b)   I am aware that even though relevant assets, telephones, and properties are often held in alias or third-party names, drug dealers continue to use and exercise dominion and control over them;

c)   I am aware that drug dealers often maintain on-hand quantities of currency and drugs in order to finance their ongoing drug business;

d)   I am aware that drug dealers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the transportation, ordering, sale and distribution of controlled substances, even though such documents may be in code. It is particularly common that individuals engaged in drug trafficking will keep ledgers related to their illegal activity because drug dealers commonly "front" drugs (provide controlled substances on consignment) to their clients, and are frequently "fronted" drugs by their own sources of supply as part of their dealing operations;

e)   I am aware that the aforementioned books, records, receipts, notes, ledgers, etc., are commonly maintained where the drug dealers have ready access to them, i.e., homes, automobiles, businesses and safe houses;

f)   I am aware that drug dealers will frequently keep records, notes, ledgers, contact lists, and other evidence of their drug trafficking on digital devices (i.e. cellphones, computers, tablets, etc.) and that they often keep such digital devices, particularly cellphones, on their person or on the premises that they control. Further, I am aware that drug dealers will often have multiple digital devices, and will frequently use more

3

than one digital device to help conduct their drug trafficking. I am also aware that drug dealers will use these digital devices to further their drug trafficking through the use of digital communication, including, but not limited to, e-mail, calls, and instant messaging. Further, I am aware that drug dealers will attempt to conceal the information on their digital devices that is relevant to their criminal activities through the use of encrypted applications (i.e. WhatsApp, Signal, Silent Phone) and security locks on their devices;

g)  I am aware that it is common for drug dealers to conceal contraband, proceeds of drug sales, and records of drug transactions, drug sources and drug customers, in secure locations within residences, garages, storage building, safes, and safety deposit boxes for ready access, and also to conceal such items from law enforcement agencies;

h)  I am aware that when drug dealers acquire large sums of proceeds from the sale of drugs, they attempt to legitimize their profits;

i)  I am aware that to accomplish these goals, drug dealers utilize, among other things, banks and their attendant services, securities, cashier checks, money drafts, letters of credit, brokerage houses, real estate companies, shell corporations, and business fronts;

j)  I am aware that drug dealers commonly maintain addresses or telephone numbers in books or papers which reflect names, addresses, and/or telephone numbers for their associates in the drug dealers organization, even if said items may be in code;

k)  I am aware that drug dealers commonly take photographs (or cause photographs to be taken) of themselves, their associates, their property and their products, and that

4

these dealers usually maintain these photographs in their possession and at their residence;

l)     I am aware that firearms are commonly used by drug dealers to protect their inventory and currency;

m)     I am aware that drug dealers that work at a clandestine meth lab will often keep materials associated with the manufacturing of meth at said location (i.e. chemicals such as Acetone, full and used propane tanks, large cooking utensils, pots, pumps, hoses, sifters, drying racks, personal protective equipment, etc.) and other locations that are used by the organization throughout the manufacturing process.

## **PROBABLE CAUSE**

5.     Law enforcement first became aware of Oscar Hernandez (Hernandez) and the drug trafficking organization (the "DTO") described herein in 2018 during an investigation targeting the Irish Mob Gang ("IMG"), an Oklahoma prison gang that was trafficking drugs across the state of Oklahoma and beyond. During the investigation, which utilized Title III wiretaps, law enforcement intercepted Hernandez and identified him as one of the IMG's principal sources of supply of methamphetamine. These IMG members and their associates were ultimately indicted and convicted. *See United States v. Velasquez*, CR-18-260-SLP. Next, from roughly 2019 to 2021, law enforcement began targeting Hernandez's distribution network. During that portion of the investigation ("Phase 1") investigators uncovered a massive methamphetamine distribution network led by Hernandez.

6.     Phase 1 established that Hernandez, who was residing in San Luis Potosi,

Mexico, relied on trusted family members and confidants in Oklahoma to conduct the day-to-day operations of the DTO. Those individuals in Oklahoma distributed thousands of pounds of methamphetamine to customers of the DTO and collected millions of dollars in drug proceeds—all at Hernandez's direction. Prior to that distribution, the crystal meth was converted from its liquid form at multiple clandestine laboratories in rural Oklahoma. While these labs were owned by Hernandez's family members and co-conspirators, the individuals that worked at the labs (hereafter referred to as the "lab workers") appeared to report to the ultimate source of supply, whom cooperators identified as "Mamisan". Law enforcement also found evidence indicating "Mamisan" was the individual responsible for coordinating the shipments of liquid methamphetamine from Mexico to Oklahoma; the investigation established that the methamphetamine was being transported in the fuel tanks of a semi-truck, which was owned by and registered to a company called DGC Express. DGC Express, in turn, listed its registered agent as Nelly Gutierrez (Nelly), according to the Texas office of the comptroller. Once the semi-truck arrived in Oklahoma, it was received by the lab workers at a private location, where the liquid methamphetamine could be extracted, placed into transportable containers, and ultimately taken to the clandestine lab location for conversion.

7.      As a result of Phase 1 of the investigation, federal charges were filed in the Western District of Oklahoma against more than forty persons, including Hernandez (*see United States v. Hernandez*, CR-21-76-SLP), members of his incarcerated customer base (*see United States v. Baswell*, CR-21-77-SLP), and two truck drivers (*see United States v. Cedillo*, CR-21-288-SLP, and *United States v. Lucio*, CR-21-289-SLP). In addition, law enforcement executed over a dozen search warrants, including at the liquid methamphetamine delivery

6

location and two clandestine labs used by the DTO. Law enforcement also made significant drug and money seizures, including over one thousand pounds of methamphetamine and more than $1 million in U.S. currency. At the time, this coordinated effort significantly disrupted Hernandez's and the overall DTO's operation. It was not until the fall of 2022, however—with the help of a newly developed confidential human source (CS1)1—that law enforcement launched the second phase of the investigation into the DTO described herein.

8.      Since phase two of the investigation launched, law enforcement has identified the same organization, albeit with some new players, continuing to function using virtually the same *modus operandi*.

9.      Two of the main players in this phase of the investigation are Ray David Lara (**LARA**), who resides at the **Subject Property**, and Adrian Perez (PEREZ). They have been identified as key members of the DTO working in and around Oklahoma City.

10.     On October 20, 2023, United States District Judge Scott L. Palk for the Western District of Oklahoma, issued an order—the Government's application for which named **LARA**,

---

1       CS1 was arrested by law enforcement for drug related crimes. CS1 thereafter agreed to assist law enforcement and began providing information relating to this investigation in the fall of 2022. Prior to this last arrest, CS1 had been convicted of drug related crimes in 1998 (manufacturing), 2007 (trafficking), and 2021 (possession). CS1 furnished information to law enforcement in hopes of receiving consideration for his/her most recent pending charges. CS1 has also received $1,000 in monetary compensation to date for his/her cooperation. The information provided by CS1 has been corroborated through other investigative techniques including physical surveillance, consensually recorded conversations, and telephone analysis. Information provided by CS1 has been reliable and I am unaware of any knowingly false information furnished by CS1. Information attributed to CS1 herein, unless otherwise noted, was obtained by CS1 through his/her personal observations or conversations with targets of this investigation and their associates.

PEREZ, and OSCAR as "Target Subjects"—authorizing the continued monitoring and recording of visual, non-verbal conduct inside the DTO's warehouse located at 701 SE 29th St., Oklahoma City, Oklahoma (hereinafter, the "29th St. Shop"), which the investigation had established the DTO was using to discreetly extract liquid methamphetamine from the gas tank of a semi-truck.

11. On November 10, 2023, pursuant to the authorization described above, law enforcement was able to record a shipment of liquid meth being delivered to the warehouse in which **LARA** and PEREZ were present. That day, two of the DTO's conversion lab workers—Edgar Rodriguez Ontiveros (RODRIGUEZ) and Jose Equihua (EQUIHUA)—were the first to arrive at the warehouse, at approximately 7:18 a.m. Shortly after arriving, RODRIGUEZ appeared to inspect a large, white, intermediate bulk container with metal caging around it (hereinafter, the "IBC tank").

12. At approximately 8:15 a.m., EQUIHUA opened the middle garage bay door, and a black semi-truck, with Michael Estrada (ESTRADA) driving, arrived at the warehouse and pulled into the middle garage bay, with the door closing behind it. RODRIGUEZ then moved the IBC tank to a position adjacent to the black semi-truck's passenger-side fuel tank(s). The two lab workers, using two pumps and two sets of hoses, appeared to extract liquid meth from the fuel tank into the IBC tank. The pair finished at approximately 8:32 a.m., and ESTRADA then departed with the black semi-truck. Four minutes later, at approximately 8:36 a.m., **LARA** arrived at the warehouse driving a white Dodge pickup truck, which was towing a black pull-behind trailer. PEREZ also arrived shortly after on foot. For the next hour or so, the two lab workers, **LARA**, and PEREZ worked to load the IBC tank inside the black pull-behind

trailer. The group also loaded propane tanks and what appeared to be containers of a chemical substance, such as acetone—both of which I know based on my training and experience are commonly used to convert liquid methamphetamine to crystal form.

13. The lab workers, driving a red pickup truck, ultimately departed the warehouse at approximately 9:54 a.m., and PEREZ, driving the white Dodge pickup truck and the black pull-behind trailer, departed shortly thereafter. The pair then arrived in tandem to 980801 S Stage Coach Drive, Wellston, Oklahoma—a location law enforcement has now confirmed is a clandestine meth lab (hereafter referred to as the "Wellston lab").

14. Over the span of the last several months, law enforcement has applied for, and has been granted search warrants to receive the prospective location information for **LARA's** cell phone, which has been invaluable to law enforcement's investigation. For example, on November 29, 2023, and December 3, 2023, law enforcement was tracking the DTO's transportation of meth between the Wellston lab and **LARA**'s car wash, located at 221 SW 29th St., Oklahoma City. On both of these dates, the surveillance cameras placed at both locations indicated to law enforcement that a shipment was being transported.

15. Another liquid meth delivery happened on December 6, 2023, and two days after the delivery at the 29th St. Shop, law enforcement executed a search warrant at the Wellston Lab, confirming it was as suspected a methamphetamine conversion lab. Law enforcement found a fully functioning meth conversion lab, recovered more than 1000 lbs. of liquid and crystal meth[2], and arrested both Rodriguez and Equihua on site.

---

2   Field tests resulted in presumptive positives, and official results from the DEA lab in Dallas, Texas have confirmed the substances as methamphetamine.

16. Surveillance has determined that the **Subject Property** has served as **LARA's** primary residence since early April 2023. **LARA** has regularly been observed coming and going from the **Subject Property**. **LARA** was most recently observed staying there the night of March 18, 2024.

17. In closing, the multiple instances observed via surveillance of **LARA** residing at the **Subject Property**, as well as the GPS location taken from his cell phone confirm the **Subject Property** is the main residence **LARA** resides at. Based on my training and experience, in particular with DTOs, and that facts described herein, I believe the **Subject Property** as recently as March 2023 has been used to store fruits of **LARA**'s crimes related to trafficking methamphetamine. I know that members of DTOs keep evidence of their crimes at their residence, such as but not limited to, ledgers, money, computers, cell phones, and other electronics. I therefore believe that the **Subject Property**, which is located in Oklahoma County, Oklahoma, and the therefore the Western District of Oklahoma, will have evidence of the DTO's crimes.

### INFORMATION PERTAINING TO UNLOCKING ELECTRONIC DEVICES WITH BIOMETRIC FEATURES

18. The warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant. I seek this authority based on the following.

19. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices,

particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

20. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face.

21. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

22. As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

23. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

24. In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at the **Subject Property** and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

25. Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law

enforcement personnel to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the **Subject Property** and reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device; (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

## CONCLUSION

26. Based on the foregoing, I respectfully submit that there is probable cause to believe that evidence relating to violations of 21 U.S.C. §§ 841(a) and 846 will be found at the **Subject Property**. I therefore respectfully request issuance of search warrants for the **Subject Property** (as set forth in **Attachment A**) based on the above-mentioned facts.

**FURTHER, YOUR AFFIANT SAYETH NOT.**

_____
Hanna Ortego
Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me this 22nd day of March, 2024.

_____
SHON T. ERWIN
United States Magistrate Judge

13

## Attachment A

## ADDRESS TO BE SEARCHED

1520 SW 25th Street, Oklahoma City, OK.









## Description:

The **Subject Property** is located at 1520 SW 25th Street, Oklahoma City, Oklahoma 73108. The property is a single level residence on the south side of SW 25th Street, and is the fifth structure west of S. Kentucky Ave. The residence contains dark grey wood siding with light grey wood trim and has a white front door and white screen door that faces to the north towards SW 25th Street. There is a large carport in the same color on the north side of the residence in front of the front door. The front yard is covered in cement and has a cement driveway down the east side of the residence and has a white sided separated structure on the rear of the property to the south of the residence. The front approach to the front door has a cement step up porch and contains black wrought iron railing. In front of the residence just to the north of the residence on the south curb line is a white mailbox that has the numbers "1520" on top of the mailbox.

## Attachment B

## ITEMS TO BE SEIZED

The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (manufacturing, distribution, and/or possession with intent to distribute, controlled substances) and 21 U.S.C. § 846 (conspiracy to do the same), namely:

1. Documents, records, or materials related to the distribution of illegal drugs, including, but not limited to: ledgers, address books, telephone books, telephone bills, telephone records, rent receipts, rental car agreements, mini-storage receipts, cellular telephone agreements, pager rental agreements, bills and receipts related to cellular telephones and pagers, and any property and/or U.S. currency being proceeds of or related to the distribution of illegal narcotics. Also ledgers containing quantity of narcotics possessed, ledgers of money owed to the suspects for narcotics they have provided to co-conspirators, ledgers of money owed by the suspects to their suppliers, transportation and distribution instructions for the narcotics being sold, and other types of documentation regarding the sale of narcotics.

2. Financial documents evidencing the illegal distribution of controlled substances, including, but not limited to: bank statements, bank deposit slips, canceled checks, money orders, money order receipts, wire transfer receipts, stored value cards, handwritten notes depicting monies owed for illegal controlled substances, documents showing purported income, and any other evidence showing monetary records of the illegal distribution of controlled substances.

3. Documents, records, or materials related to the laundering of money, including, but not limited to: wire transfer receipts, bank deposit slips, bank withdraw slips, money order receipts, records detailing the purchase of property, items which show control of real property placed in nominee names such as utility payment records, property

1

tax payment records, key to real property, receipts from payment of insurance premiums paid on residences/vehicle.

4. The fruits and proceeds of the illegal distribution of controlled substances, including, but not limited to: large amounts of currency, financial instruments and other items of value showing the spending of large sums of money made from engaging in the illegal distribution of controlled substances, or other illegal activities.

5. Any digital device used to facilitate the above-listed violations or containing evidence falling within the scope of the foregoing categories of items to be seized, and forensic copies thereof.

   a. With respect to any digital device used to facilitate the above-listed violations or containing evidence falling within the scope of the foregoing categories of items to be seized:

      i. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

      ii. evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

2

      iii.    evidence of the attachment of other devices;

      iv.    evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

      v.    evidence of the times the device was used;

      vi.    passwords, encryption keys, and other access devices that may be necessary to access the device;

      vii.    applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

      viii.    records of or information about Internet Protocol addresses used by the device;

      ix.    records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

b.    As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form,

3

        including in digital form on any digital device and any forensic copies thereof.

    c.    As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, cellphones, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

6.    Items which tend to show dominion and control of the property searched, including, but not limited to, utility bills, telephone bills, correspondence, rental agreements, property tax payment records, receipt from the payment of insurance premiums on the residence, and other identification documents.

7.    During the execution of the search of the Subject Property described in Attachment A, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the Subject Property and reasonably believed by law enforcement to be a user of a device found at the premises, to the fingerprint scanner of the device; (2) hold a device found at the premises in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.